Almost a decade after the worst financial crisis since the Great Depression, experts still can't agree how banks should have reacted in the moment and what caused over 300 banks to fail. Mr. Shabudin's prosecution raised equally complex questions, but the government was able to avoid these complexities through critical errors at trial and sentencing. I'll address these errors in three categories. The first is the Pinkerton Instruction Error, the second is the Lack of Causation Evidence at Sentencing, and the third, if there's time or if there are questions from the court, I'll address the pure legal errors that require reversal with regard to the victim enhancement and the bond transfer order. First, the Jury Instruction Error on the Pinkerton Theory. There's no dispute that the main portion of the instruction misstated Pinkerton liability to inform the jury, but as long as the jury found that co-defendant and Chief Witness Thomas Yu committed just one of the substantive offenses, Mr. Shabudin could be held viable for all five of them. This, of course, is not a technical error. This fundamentally changes the very scope and substance of Pinkerton liability. Now, the introductory portion of the instruction did not correct this error, as the government asserts, and the problem with the introductory paragraph is explained by the Supreme Court in the case Francis v. Franklin, which we cite. In that case, the Supreme Court explained that when there is a proper portion of the instruction and an improper portion, there are two possibilities both of which can result in prejudice. The first is that the jury reads the incorrect, incorrect portions in harmony, and then the second possibility is that the jury follows one of the portions, but it is impossible for the reviewing court to tell which portion the jury followed. Now, here the error was prejudicial and affected Shabudin's substantial rights because the very strongest case for conviction was based on Mr. Yu's testimony at trial. Yu admitted at least five times during his direct testimony to the sort of acts that would constitute count seven, which is false reporting, and the jury knew that he pled guilty to a conspiracy to commit that count. Given the strength of the evidence against Mr. Yu based on his own testimony, there was the clearest path to conviction for the jury, and so there is at least a reasonable possibility the jury relied on the theory and the court must reverse.  On two main issues, one is what caused the bank's failure, and the second is the basis of Mr. Shabudin's salary as a gain. Starting with the bank's failure, Judge White based the staggering $1 billion award of restitution on a finding that offense conduct was a material factor in causing the bank's demise. This is both a factual clear error and a legal error. It's a factual error because the evidence does not support this finding, and it's a legal error because material factor isn't the test. The government had to prove that more likely than not, the bank would not have failed but for offense conduct. And the government admits that no one actually testified that the bank failed because of the offense conduct. The only evidence in the record about this bank's failure is the summary interview with Paul Killian, and this summary interview ends up contradicting the government's theory of causation for a few reasons. Killian said that even with the delayed restatements that could be attributed to offense conduct, he was still optimistic about saving the bank because he had done so for other banks. Secondly, he said that there was interest in the bank and that government approval of those solutions to saving the bank would be the possible hindrance. And third, Killian remained optimistic about saving the bank up until the very day that the government closed it along with four other banks. Now the other evidence at trial emphasized that 300 banks with similar loan portfolio problems, including some of the most venerable, failed during the same time. On this record, the government did not and cannot prove that the bank would have survived but for offense conduct. This means that the restitution award must be reversed, and it also means that the enhancement for jeopardizing the safety and soundness of the bank must be reversed. Now the second causation problem was that Judge White used Mr. Chabadin's salary as a gain for purposes of a 12-point sentence enhancement without evidence that it resulted from offense conduct. Mr. Chabadin received the same salary long before offense conduct ever started. He received this salary for his primary role as Chief Operating Officer. He didn't receive a cent more when he took on the additional duties of Chief Credit Officer that ultimately involved him in offense conduct. These courtesies not addressed the use of salary as a measure of gain, but the Fifth Circuit has done so and it's rejected the notion that unlawful conduct contains the income entirely. This is the United States v. Smithson case that we cited in our opening brief. And in that case, the defendant provided legal services for some invalid or unlawful transactions as well as some lawful transactions. And the Fifth Circuit reversed to the extent that the gain enhancement included fees that were earned for lawful transactions even though those lawful transactions were related to the unlawful transactions. Mr. Chabadin became Chief Credit Officer. He did not relate Greene's title as Chief Operating Officer, is that right? Absolutely right. So he was still wearing that number two hat, was he not, in your position? Precisely. In the testimony, a trial supported that that by itself was a grueling job which was, you know, full-time in its own right. And so the additional would be increased. Who didn't bring somebody else in to take Chabadin's place when he took that eight-month stint as Chief Credit Officer? Absolutely not. And that's why Mr. Chabadin expressed reservations about that and said, I will only take on these additional duties while you find someone else because it wasn't his job. That didn't happen, right? Right. And he kept doing the full job. Right, for which he received not a cent more. And so the lesson from Smithson is that, you know, there's no discrete amount that can be actually pinned to these additional tasks. And the government hasn't made any sort of argument as to the portion of the salary that could even be attributed to these additional tasks. Now, because there's no evidence that the salary resulted from offense conduct, the 12-point gain enhancement must be reversed, as must the fourth interorder, which was based on the use of Mr. Chabadin's salary as a gain from offense conduct. And this ties into the pure legal areas that I wanted to discuss. What did the pre-sentence report shed any light on this? What did the district court follow it with respect to some of these calculations? The pre-sentence report did say that the salary should be used and just cited the language that it resulted from offense conduct, I think without giving a very full explanation. And notably, the pre-sentence report did so because it found that the loss to the bank's failure could not be foreseen by Mr. Chabadin and the causation from Mr. Chabadin's own actions could not be reasonably assessed as playing a role in the cause of the bank's failure. Now, the use of his salary also affected the victim enhancement, and that's the pure legal error, one of the pure legal error issues that I wanted to address. This court's precedent in Armstead, Brown, Pham, all of which we've cited in our briefs, includes the use of a victim enhancement when no victim's actual losses have been used as part of a loss gain enhancement. Here, the court chose to use a gain enhancement. And so, under this court's precedent, there is no way to apply the victim enhancement. And the government has not squarely addressed this court's precedent. The government, instead, tries to compare this case to a Second Circuit case, which we've distinguished and explained cannot supplant this court's precedent, of course. Now, the second pure legal error was with regard to the bond transfer order. Very briefly, Federal Rule of Criminal Procedure 46G says that as soon as the defendant surrenders himself, the bond must be exonerated to the surety of which here was Mr. and Mrs. Chabadin. And by law, the court clerk did not have the money in the possession to transfer it to the government when the government sought it a month after Mr. Chabadin surrendered himself to custody. One final point I'd like to make is that the government does not argue anything else than a closed record remand. And for the reasons we said in our 28-J letter and the reply brief, any further proceedings on sentencing must be on a closed record. And unless the court has further questions, I'd like to save the remainder of my time for rebuttal. You do want it on a closed record? Yes, absolutely. Thank you. Thank you. Thank you. Thank you. Good morning. May it please the court. Dr. Wilson, on behalf of the United States. Starting with the trigger to destruction. The defendant waited four months before raising the trigger to destruction, which was not a situation where the defendant didn't object to an evidentiary ruling that was made on the spot or to the district or to the government's admission of evidence that it had not, excuse me, not had noticed something. This was four months where the defendant twice submitted jury instructions that contained the very error that he's raising with this court. In addition, the defendant did not rely. Four months. What was going on? The pre-trial proceedings, the defendant, Judge White, likes all the proceedings taken care of fairly early. And so the defendant and the government had to submit jury instructions in December. The time with them being in March. And so there was that period between the additional submission of jury instructions. So how about this instruction? Well, the government proposed this instruction. The defendant then proposed the same day another trigger to destruction as well. Slight changes, but no changes that affected the, or no changes that went to the errors that he's raising in this court. Because it was first challenged when? It was first challenged on appeal. As I understand it, the defendant submitted proposed jury instructions in December. He again submitted proposed jury instructions right before the jury charge conference jury trial. And at no time did he raise the errors that he's raising in this court. So he's claiming that it's plain error, but how plain can it be? I would ask if the defendant twice proposed the same instruction. Okay, I didn't understand much of that. I waited four months. If it's an objection, it's never made. Well, you're right. He waited more than four months, actually, because he waited until, he waited from the initial submission of the jury instructions to this appeal in order to raise the claim that the paper-to-destruction was incorrect. In addition, he never relied on the paper-to-destruction. He never claimed that the defendants should be acquitted because no one else had committed the offense. The government only mentioned figures at once in its closing argument. It was a sort of a throwaway argument in the initial closing. And there's substantial evidence that Chabrini committed each of the offenses charged implicitly so the jury would not have had to rely on the paper-to-destruction as well. So in our view, the paper-to-destruction is not plain error. It's not plain because the defendant never relied on it, even though he had the chance. And it's not, it's just in terms of substantial rights because there was some substantial evidence that the defendant committed the offenses himself. Turning to the restitution, the defendant's argument is that there was no showing that the defendant caused the loss or the failure of the bank. But in our view, the district court is free to draw whatever inferences it wants or that are from the evidence that is after the entire trial. So it was aware of the inferences. And those inferences were as follows. The jury found that the defendant concealed at least $100 million in losses. And those losses caused the bank to withdraw its financial statements in May of 2009. But you're saying he acted alone and did that? No, I'm not saying he acted alone. I'm saying he acted, but he did sign all of the risk rating forms. But it was the conspiracy that he was charged with that is ultimately responsible for causing the losses. You're not saying he's the one that funny-noted the records, are you? Yes, Your Honor, I am saying that. He did funny-up some of the records. All these other guys were little lambs? Well, what we're saying, what the evidence showed, was that Schaubergine signed all of the risk rating documents. He was one of the signatories on the risk rating ratings. But basically, they had to keep that $10 billion threshold in order to keep operating? In China, they had to keep a $10 billion threshold. That's correct, Your Honor. But I think the bank failed because, if I can skip down a little bit, I think the bank failed because it could not publish or put forward audited financial statements. And Mr. Killians couldn't recapitalize the bank. He was optimistic about recapitalizing the bank. But I think what counsel has left out is that he could not do so if there were no audited financial statements. And the losses that the defendant caused caused the bank to withdraw its audited financial statements in May of 2009. And this all occurred during the eight months that he was a CCO? That's correct, Your Honor. Yes, that's correct, Your Honor. Actually, the fraud did not start until the end, until the third quarter of 2008, which was when he became the chief credit officer. So just to recap, we think that the evidence does show that the defendant caused the loss to the bank, caused the failure of the bank. Because the defendant concealed losses, those losses caused the bank to withdraw its financial statements. Without audited financial statements, the bank could not be recapitalized, and therefore it failed. So Mr. Killian may have been optimistic, but he couldn't recapitalize the bank without audited financial statements. He gets tagged with all of the failure, right? Well, yes, Your Honor, because he was a member of the conspiracy. The conspiracy caused the failure of the bank, and his liability for the restitution order is 27. So I think there are two steps here. One is, did he cause the failure of the bank, or did the conspiracy cause the failure of the bank? And is it proper to impose joint and separate liability? And we think that the answer to both questions, in most steps, is in the affirmative. But he did cause substantial losses in the district court case. I don't know. I have trouble understanding this. The district court said that the defendant's position was the market conditions caused hundreds of other banks to fail. It was the market conditions that created the loss. But the district court said the market conditions were closely connected to the offense conduct. The deteriorating market conditions were well known to the defendant and formed the context for his crimes. He was an experienced professional. So, somehow, because he was taking advantage of what was happening in the market, he gets tagged for all of the bank's losses. I'm not sure I understand that. Well, you're right about that. What the bank didn't do was reserve for the losses. If the bank had created proper reserves for the losses, it may have survived the downturn in finances. Many banks did. And our suspicion is we don't really know whether this bank would have survived. But we do know that the jury found that he had hidden more than $100 million worth of losses. And as a result, the bank did not reserve for those losses. And that is what caused the failure. If I'm not answering the court's question, I'm sorry, I'm having a hard time. I'm not as clear, though, in the way that the district court's order explained it, I guess. But I think the bottom line of the district court's order is that many banks did not fail. Some did, some didn't. But many large banks, and this was a very large bank, did not fail because of losses that had occurred. A lot of banks had incurred real estate losses during this period. But not all banks failed. He was the only one of the principals that went to trial. He was the only one that went to trial. We have not yet. Mr. Wu, who is the CEO of the bank, is currently in China. He's in Hong Kong, and he's been sued by the SEC. We have not proceeded against him as of yet. But he was the only of the other principals that went to trial. On the... How about the other... What kind of restitution? Do the other defendants want to testify? We worked out a plea arrangement, but the other... He's the CEO. He's not aware to provide restitution. That's not all. The O.N. has not been sentenced as yet.  to any restitution we hold. Mr. Wu. Mr. Wu. We don't know that. And, of course, we all know if Mr. Wu returns to this country and is charged, we don't know whether he will be charged for order to pay restitution as well. Mr. Wu, obviously, was the largest player in this. Can you get his salary? Do you think that's... So, our position on the salary is that... First of all, you cannot use gain unless you first find a loss. So, the district court found that there was a loss to the bank and there's no dispute that there was a loss. The district court used the salary for two reasons. First, it could not find the amount of loss to the investors in the bank. And, secondly, it could not find the amount of loss that was actually caused by the defendant. So, the requirements for the court to use gain instead of loss were met as far as the guidelines were concerned. So, this defendant, the amount of loss was the... Well, the defendant said he may have retired before he encountered or before he thought this fraud. The court found that he sought to enhance his reputation by having the bank succeed and, therefore, he earned his salary because he was the chief credit officer but he also earned his salary engaging in the fraud. And the third thing is, and this is really not in our brief, is that Mr. Wu stated in a meeting that everyone would be out of a job if the bank failed. And so, the defendant knew when he engaged in this social conduct that he could lose his salary, he could lose his job if he did not engage in the fraud. So, under those three circumstances, using the gain was an appropriate way to determine whether the defendant... I'm sorry, to determine the defendant's loss. It's the government's position that it was because he moved in as the chief credit officer and they took on that additional duty is what put him in this position where he bears almost a billion dollars worth of liability for the clause. Well, no, he didn't pass away for restitution, but not for the loss. He lost his salary. And, you know, I would say that that is the role of the chief credit officer, which is to determine the amount of reserves that the bank should take. That is his number one responsibility. And he committed fraud during that in discharging that responsibility. So, it is not wrong that District Court 2 abuse is gained. It is also not wrong, for the reasons I've stated, that the District Court 2 imposed the restitution on him. I want to basically talk about the closed versus the open record. I'm a little short on time, so I'm going to use to mention that. First of all, we don't think that a closed record should ever be the case as the court finds plain error. By definition, the government is being penalized because the defendant did not raise a lawsuit. So, if the defendant is claiming that this court committed plain error, a closed record is never, in our view, appropriate. Secondly, if the court, if this court, imposes a new standard on the District Court in remanding, again, we would submit that a closed record is not appropriate, because the District Court is using a new standard or a different standard than it applied, and it may want to take additional evidence. And it should not be limited in its ability to do that. And third, there's no, the District Court, well, in this case, it's not clear. The District Court said on the, during the trial, so it's not clear that it would take additional evidence, but it should not be limited. It should not be the default that the District Court can't do that. It should be able to take new evidence if it believes that it is necessary, and the District Court should make the first determination, especially in a case as complicated as this, whether it's taking additional evidence or not. ... ... ... ...  ... A few points on rebuttal, Your Honors. The first is that my colleague has raised some right hearings with regard to the Pinkerton error. The first is his argument that because trial counsel didn't catch the obvious error in the Pinkerton instruction, it must not be plain. This Court has rejected that time, and again, that is the very premise of plain error review, that trial counsel missed an obvious error, and that's why we have plain error review to correct obvious errors. ... ... ... Absolutely, Your Honor. And I'll just note that in the United States v. Gallerani case that we've cited, the Second Circuit felt that precisely this type of error in the Pinkerton instruction was plain error. Now, on the prejudice point, I'll note that trial counsel was instead, I think, focusing on challenging the instruction on a ground that goes to prejudice. The prosecution wrote this instruction and modified the model instruction, which simply says that if the jury finds a co-conspirator has committed an offense, then the defendant can be held liable for that offense. The government specifically wrote in Thomas U., even though there were multiple co-conspirators in this case, and that underscores the point that the government itself knew that its strongest case was based on Mr. U. Trial counsel for Mr. Chauvinine argued that no particular co-conspirator should be identified in the instruction, and so I think the focus was on that point at trial, but of course the plain error review, you know, the failure to object, doesn't matter. And then as far as the prejudice factor, my colleague at most said that there was substantial evidence for the jury to find that Mr. Chauvinine committed these crimes through direct liability. That is not the standard, as this court said in United States v. Christians, in which we cited in our reply brief. If there's an erroneous instruction, the government must prove, beyond a reasonable doubt, that the jury would have found on a valid theory. And the words that my colleague used don't even meet that standard, nor has any of the evidence that they've put forth in their answering brief.  again, my colleague used unsupported assertions to support the award. He is now disputing Paul Killian's optimism about saving the bank, but his very argument relies on Paul Killian's statement that the restatements had some sort of effect on the bank. But when you view Paul Killian's interview as a whole, he says, first of all, that the restatements were only one of many factors that, even in isolation, can't meet the test, the but-for test. But of course, even in a larger context, Paul Killian explains why he thinks the bank still could have been solved and why the government itself was an impediment. And then on his point about reserving more loss, that fundamentally misunderstands the problem with reserving more loss allowances. That will actually cause liquidity problems for the bank sooner, and so that speaks, if anything, to the fact that the bank would have failed sooner and was going to be left. Just a factual point that my opponent spoke to is that the conspiracy did start before Mr. Shahroudian became involved, and the government linked it that farther, and Mr. Yu was already involved with it with other co-conspirators. And finally, I just want to end on the profound consequences of these errors. The three sentencing errors we've identified add at least a six-year difference to two years to eight years. And the $1 billion restitution award financially in debt to Mr. Shahroudian and his wife, it's not a fantastical number that he can ever be expected to repay. It's an honest and real debt, and the government has actually taken a lean on his modest house in this amount. None of these errors are anomalous. None are insubstantial, and we ask you to reverse the call of these errors. Thank you, Your Honors. Ms. Martinez, your decision. Thank you, counsel, for your arguments. The next case, the last case of the counter-argument is United States v. Moxeralla.
judges: Schroeder, Rawlinson, Stafford